# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 5009-VCG |
| | ) | |
| SWEETWATER POINT, LLC and | ) | |
| LEHMAN BROTHERS HOLDINGS, | ) | |
| INC., | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 9, 2017
Date Decided: May 23, 2017

Gerald I. Street and John I. Ellis, of STREET & ELLIS P.A., Dover, Delaware, *Attorneys for Petitioner*.

Richard P. Beck, of RICHARD BECK LLC, Wilmington, Delaware; John H. Newcomer, Jr. and Thomas P. Carney, of MORRIS JAMES LLP, Wilmington, Delaware; Craig A. Karsnitz, of YOUNG CONAWAY STARGATT & TAYLOR LLP, Georgetown, Delaware, *Attorneys for Respondents*.

GLASSCOCK, Vice Chancellor

Real property is a unique asset. It cannot be consumed, although its fruits may. In can be conceptually possessed, but not physically deployed or moved. Ownership of realty is simply the right to exclude others from the use and fruits of the land. Nonetheless, ownership of real property is basic to, and perhaps the basis of, our economic system. Because land cannot be "possessed" in the way that personal property can, peaceful and efficient use and alienation require community acceptance of the identity of the landowner. In common law jurisdictions, the systematic registries of deeds to realty provide one of the most long-running and elaborate sets of historical documents available. Land grants in the area in context here—Sussex County—can be traced back to grants and patents from the European sovereigns who asserted ownership—by fiat and by force of arms—starting in the 17th century. A diligent and motivated researcher can carry title to a Lincoln farm field or a suburban Ocean View acre back to colonial times.

Even careful registration, as with any work of humankind, is imperfect. Claims of title reaching back hundreds of years are inevitably dogged by imperfections; calls to boundaries that fail to close, or to monuments lost; bureaucratic transfer documents with incomplete property descriptions, and the like. Inevitably, therefore, disputes as to ownership arise. If every such dispute required a tracing of title over the entire history of the land back to the founding grant,

litigation over title would be an expensive, exhausting, and frustrating pursuit. It would, in other words, resemble the case before me here.

To avoid such problems inherent in title, the common law developed the doctrine of adverse possession. In Delaware law, exclusive use of a parcel of property—in a way that makes it clear that the claimant is asserting his rights over a prescriptive period of twenty years[1]—trumps record title. The utility of the doctrine should be obvious, but I admit it is more obvious to this judge now than at the time this title action was filed many years ago. Where multiple claimants assert different chains of title to a single parcel, the claimant who, with her predecessors, has openly asserted "possession" of the property for the prescriptive period trumps all others, and no wearisome title examination is required. Toward he who refers to the Delaware concepts of adverse possession and title by prescription as a quaint and senescent doctrine, my attitude echoes Mr. Scrooge: may he "be boiled with his own pudding, and buried with a stake of [Milton] holly through his heart."[2]

If the doctrine of adverse possession applied here, this would be an easy case; the property involved has been used exclusively by the predecessors of one of the two claimants here, Sweetwater Point, LLC ("Sweetwater"), for a period exceeding

---

[1] *See, e.g*, *Tumulty v. Schreppler*, 132 A. 3d 4, 23–25 (Del. Ch. 2015) (discussing requisites to a finding of adverse possession); 10 *Del. C.* § 7901 (prohibiting entry unless before twenty years after title accrues).

[2] Charles Dickens, *A Christmas Carol* (1843).

2

twenty years. The other party seemingly forgot that it had taken a deed to the property in the 1930's, and made effectively no use of the parcel. The latter party is the State of Delaware, however, which as sovereign is exempt from loss of title by adverse possession, absent consent by statute.[3] This case, therefore, became a long slog through title documents and supporting evidence, back to a late colonial-era patent of a tract known as "Dry Boots," at the headwaters of the Indian River above Millsboro. The parties have been indefatigable in pursuing this title claim.[4] As will be described below, this Memorandum Opinion addresses only the issue of title between the two claimants; a damages trial and determination awaits further litigation.

Before I turn to the facts, it is appropriate to set the stage for what follows. Sussex is a long-settled land, and the ghosts and bones of the past poke through its (relatively) modern façade on every hand. The neighborhood of Dry Boots was, in times past, busy and commercial. Before the age of steam and fossil fuel, in a flat country like southern Delaware, elevation was power. Every odd fathom of drop in elevation along a creek represented potential energy, which was assiduously tapped.

---

[3] *State v. Phillips*, 400 A.2d 299, 302–03 (1979). The last such statute was repealed in 1953. *Id. See infra* note 10.

[4] The discovery here has produced a fascinating portrait of 19th century life in the vicinity of Dry Boots. The parties should be congratulated on their diligence; it is also incumbent on me to point out that the long pretrial litigation and the trial itself, although fraught with vexing issues, were conducted by counsel here in an exemplary manner of civility and courtesy notwithstanding the pursuit of zealous advocacy, in the finest tradition of the Delaware Bar.

This is graphically represented in the maps bound as Beers Atlas.[5]  A reader of that 19th century work will note millponds strung along Sussex creeks and branches like pearls on a necklace; each turning the stored energy of water behind a mill-dam into power to run industry: grist mills, saw mills, wool-carding machinery and the like. Millsboro is named for its many water-driven mills, all now gone or abandoned. Today, Indian River, the major waterway in eastern Sussex, terminates at the Millsboro Mill Pond dam.  Before the dam, Indian River proper was formed by the confluence of its Mirey and Cow (or Doe) Bridge branches, at Dry Boots.  The construction of Millsboro Mill Pond dam drowned the mouth of Cow Bridge Branch, but upstream, several more mill ponds and mills existed.  One pond on the branch, Morris Mill Pond, near Zoar, remains; the others are gone, but remnants of the mills and dams—and the ghostly outlines of what once were mill ponds—persist.

Of these latter, one is of particular importance here: the Doe Bridge Mill and its pond.  There have likely been more than one mill at the site; the remains of a mill and race can be seen on the east side of the branch.  The bridge that carried the Doe Bridge Road, once a prominent thoroughfare, over Cow Bridge Branch is gone. The road itself still exists, as a dirt lane in a forested area that is as quiet and pristine as any in the state.  Only the borrow pits and the earthen portion of the dam, and the

---

[5] D.G. Beers, *Atlas of the State of Delaware* (Pomeroy & Beers 1868).

roadbed sunken into the earth by long passage of heavy loads, imply that here was a site of industry. Because the chains of title involved are difficult to follow, this Memorandum Opinion must trace that old roadbed, as a boundary line; comment on the ownership of the old pond bottom, and how it implicates the intent to transfer title to, and the location of, the disputed parcel; and opine on the location of homesteads once on a busy high road, now to be located only by the persistence of the still-blooming daffodils that once brightened their yards. After waterpower became obsolete, the area reverted to forest, and was eventually occupied by Sweetwater's predecessor in title, a peach basket manufacturer, which used the property as a wood-lot. The state owns the land to the north, an unused part of an asylum known originally as the "Delaware Colony," now the Stockley Center. As Sussex has become attractive as a place to live, the area—once industrially valuable, then largely unused for more than a century, is again valuable; to Sweetwater as beautiful, wooded home sites on high ground ("dry boots") overlooking Millsboro Mill Pond, which by Delaware standards is a large and attractive lake. The State envisions the land as a nature preserve, or as the site of a proposed Millsboro bypass highway.

My decision on title follows. For the reasons below, I find, as between these litigants, title to the disputed property is with the State.

## I. STAGE OF THE PROCEEDINGS

This is my post-trial decision on title. Based on the complexity and volume of the record before me in this matter, and in order to decrease the likelihood of what seemed an inevitable motion for reargument, I took an unusual step: I issued a draft opinion on record title to the parties, asking them to submit informal memoranda pointing out, in their view, any omissions or errors contained therein. I have closely considered the parties' submissions, the bulk of which, perhaps inevitably, consisted of recapitulation of argument already made. I have made minor adjustments from the draft form of the record title portion of this Memorandum Opinion to reflect the parties' memoranda. To the extent I have not referenced arguments therein, I have considered and rejected them.

## II. BACKGROUND FACTS[6]

The parties, via pre-trial stipulation, explained that the title dispute before me "focuses primarily on the force and effect of certain deeds made in 1867, 1879, 1891 and 1931, as well as the consequences of various actions and inactions between 1836 and 2009."[7] The record produced at trial is as daunting as is implied by that ominous stipulation. The following are the facts as I find them after a ten-day trial, review of

---

[6] The following abbreviations are used to cite to the record: Court Trial Exhibits, "CX"; Joint Trial Exhibits, "JX"; Stipulated Facts from the Pre-Trial Stipulation, "Stip"; Joint Exhibits regarding the Private Act of 1829, the "Supplemental Joint Exhibit" or "S-JX"; and Trial Transcript, "Trial Tr."

[7] Stip 7.

a record spanning thousands of pages (and hundreds of years), nearly three hundred pages of post-trial briefing, and a reopening of the record for newly discovered evidence, all of which was prepared over a seven-year period by the parties.

At dispute in this case is a sixty-three acre parcel of high ground located in Sussex County, Dagsboro Hundred, identified as 1-33-11.00-46.00 on the County tax parcel map (hereinafter "Parcel 46"). The land is currently undeveloped and heavily wooded but shows signs of a lively past, including a home in the vicinity, traces of which are evident by long-ago planted daffodils and persimmons that still grow, now incongruous in the seemingly-untouched woodlands. Parcel 46 is bounded by the old Doe Bridge Road to the north, the Mirey Branch and Millsboro Mill Pond to the south, and the Cow Bridge Branch and Millsboro Mill Pond to the east. To the west it shares a border with a 27-acre piece of land identified as tax parcel 1-33-11.00-44.00 ("Parcel 44"). Doe Bridge Road, accessible from County Road 318 (also known as Patriot's Way) and leading to the site of the former Doe Bridge and Mill, is centuries old and shows signs of heavy use in its past.[8] The County tax map depiction of these parcels is shown on Exhibit A to this

---

[8] *Id.* at 6–8.

Memorandum Opinion.[9] A satellite image with the tax map boundaries overlain is shown on Exhibit B.

The parties with competing claims to Parcel 46 are the State of Delaware and a developer, Sweetwater. This is an unusual case for many reasons, the first of which is that the parties both have colorable claims of title to Parcel 46, though neither has established title absolutely. The parties seek only an *in personam* determination of superior title, which, as will be discussed below, carries a burden of proof by a preponderance of the evidence.

By way of the most recent source deeds, the State points to a 1931 deed from Wingate Matthews (the "1931 Matthews Deed"), while Sweetwater has a 2005 deed from Winnie White Kee (the "2005 Deed"). Each deed can be traced to separate, minimally descriptive sheriff's deeds from the latter half of the 19th century. Each chain of title is more or less problematic.

As the facts below will set forth, it is clear to me that from the middle of the 20th century to the very recent past, the State was unaware of its interest in Parcel 46, while Sweetwater's 20th century predecessors-in-title clearly believed they owned Parcel 46 and exerted ownership of it, including through payment of tax assessments. In fact, were the Petitioner *any party other than the State*, which has

---

[9] The appellations "Millsboro Mill Pond, "Cow Bridge Branch," "Mirey Branch," and "Dow Bridge Road" have been added to the tax map to provide clarity to the reader.

8

legislatively shielded itself from claims of adverse possession,[10] this would be a very simple case and I would find that, if by no other basis, Sweetwater held title to Parcel 46 by way of adverse possession by its predecessors-in-title. With this context, I turn to the recent history of this dispute.

In or around 1974, Sussex County undertook a reassessment program, under which it created tax parcel maps.[11] Parcel 46, assessed at approximately sixty-three acres, was taxed to Houston-White Company ("Houston-White").[12] Throughout the latter half of the 20th century, Houston-White paid taxes on the land and timbered the land for its basket-making operations, as shown on a 1977 aerial photograph.[13] The State failed to prevent this trespass, if trespass it was, nor did they exclude others in recent decades.[14]

In 1989, the State began planning a 250-acre nature preserve (the "Nature Preserve") on an unused portion of lands attached to what is now known as the

---

[10] From 1776 to 1843, one could not obtain title to land by adverse possession against the State. In 1843, a statute was enacted that allowed adverse possession against the State, with exceptions for certain types of land. That statute was repealed in 1953 by 49 *Del.L.* ch. 386. Under the current state of the law, one cannot obtain title to land by adverse possession against the State; any claim for adverse possession against the State, therefore, would have to have begun by 1933 and ripened by 1953. *Phillips v. State, ex. Rel. Dept. of Natural Res. & Envtl. Control*, 449 A.2d 250, 255 (Del. 1982).

[11] Stip 35.

[12] *Id.*

[13] CX 1; Sweetwater Tr. Ex. 9; Stip 10.

[14] Interestingly, two of the witnesses whose testimony focused primarily on other matters, Ron Vickers and Chuck Adams, testified that they were acquainted with this property long before this dispute arose. Vickers testified that as a boy scout, he camped on the land, while Adams visited the site on horseback in the 1960s. Trial Tr. 177:7–23 (Vickers); *id.* at 262:7–16 (Adams).

Stockley Center.[15] In the process of designating the Nature Preserve, the State sent a letter to Houston-White as the owner of an adjoining parcel, but Houston-White did not respond.[16] In recording the Articles of Dedication for the Nature Preserve, which was identified as lying on Parcel 8, the State included a surveyor's drawing (the "Nature Preserve Drawing") which showed a part of Parcel 46 as within the Nature Preserve.[17] These documents were recorded in 1991.[18] The Nature Preserve Drawing is attached as Exhibit C to this Memorandum Opinion.[19]

In 1997, Houston-White—the basket-making concern previously referred to—executed a deed purporting to convey Parcel 46 to J. Reese White, Jr., Virginia T. Frazier, and Mary W. McMahon.[20] Following the death of J. Reese White that same year, Winnie White Kee, as co-executrix for Mr. White's estate, together with the estate's attorney, Harold Purnell, Esquire, contacted the State to discuss the possibility of donating or selling Parcel 46.[21] Thereafter, Kee physically met with Charles Ronald Vickers, Manager of the Land Preservation Office for the Delaware

---

[15] Stip 35. The Stockley Center was first known as the Delaware Colony for the Feeble Minded. *Id.* at 23.

[16] *Id.* at 35–36; JX 125.

[17] JX 117.

[18] *Id.*

[19] Exhibit C is a reproduction of a trial exhibit and shows the Nature Preserve Drawing with overlays showing tax parcel outlines and the plot of a 1776 deed, which will be discussed below. CX 1, Sweetwater Trial Ex. 10.

[20] Stip 36.

[21] *Id.* at 36–37; Trial Tr. 194–201 (Vickers).

Department of Natural Resources and Environmental Control ("DNREC"),[22] on Parcel 46, at which time Vickers expressed interest in the parcel on behalf of the State[23] and discussed the need for an appraisal.[24] The record is unclear as to whether an appraisal was ever sought, but, in any event, the proposed donation or sale to the State did not occur.[25]

Kee testified that Vickers did not mention either that the State already owned part or all of the property, or that it was part of the Nature Preserve.[26] Vickers testified that he was aware, at that time, that the 1931 Matthews Deed existed, but that he relied on the Nature Preserve Drawing as accurately depicting the applicable boundary lines;[27] the Nature Preserve Drawing did not include all of Parcel 46, and because the parties "spent most of [their] time walking," and looking at the

---

[22] Trial Tr. 196–97 (Vickers). The Nature Preserve Drawing shows a line cutting across the Boot of Parcel 46. As discussed below, the State's representative, Charles Vickers, thought the land below that hand-drawn line was all that Kee was attempting to donate or sell at various times. *See* Trial Tr. 203:1–14 (Vickers); *infra* notes 27–29 and accompanying text.

[23] *Id.* at 197:1–18 (Vickers); *id.* at 1416:4–13 (Kee).

[24] *Id.* at 197 (Vickers).

[25] *Id.* at 1417:4–16 (Kee); s*ee also id.* at 198:15–19 (Vickers).

[26] *Id.* at 1416:18–1417:4 (Kee).

[27] *Id.* at 198:3–14 (Vickers).

southeastern peninsula (the "Boot"[28]), Vickers was unaware that the Nature Preserve Drawing conflicted with Kee's understanding of her property lines.[29]

Other than Doe Bridge Road, which has not been improved or maintained for many decades, Parcel 46 is land-locked. At some point after meeting with Vickers, Kee purchased Parcel 44, understanding that it would make Parcel 46 more marketable to provide a means of ingress and egress.[30] She also cut a lane on Parcel 46, connecting to Doe Bridge Road, which involved extensive felling of trees; posted signs against trespassing; and installed a gate across Doe Bridge Road on Parcel 44, all without objection by the State.[31] She later listed Parcels 44 and 46 for sale, and the realtor—Bill Lingo—again contacted the State about purchasing these two parcels.[32] Lingo testified that the State, through Vickers, expressed an interest in the property again, but that such interest was not pursued;[33] the State again failed to assert that it already owned Parcel 46 or that that parcel was otherwise included in

---

[28] The reader should be wary of confusion between the name of the original land patent (Dry Boots) and casual reference in the record to "the Boot." I assume that Dry Boots was so-called because in contrast to the low adjoining properties (and much of Sussex)—note the record reference to adjoining areas of "cripple" and the "Mirey Branch"—it is a veritable Alps of well-drained upland, reaching tens of feet above sea level. Parcel 46, which roughly corresponds to Dry Boots, has on its southeastern side a peninsula jutting into Millsboro Mill Pond that is boot-shaped: the Boot. Thus the Boot is a sub-area of Parcel 46, also known as Dry Boots.

[29] *Id.* at 203:1–14 (Vickers).

[30] *See id.* at 1419–23 (Kee).

[31] *See* Stip 37; Trial Tr. 1425, 1427–28, 1453 (Kee).

[32] *See* Stip 37; Trial Tr. 200–01 (Vickers).

[33] *Id.* at 1468:18–1469:14 (Lingo). *But see id.* at 201:17–18 (Vickers) ("We [the State] indicated we did not have an interest in purchasing [the] properties" due to a lack of funds.).

the Nature Preserve.[34]   Again, Vickers testified, he relied on the Nature Preserve Drawing, which did not include the entirety of Parcel 46, and he apparently still did not realize at this time that there was a dispute as to ownership.[35]

Ultimately, in April 2005, Kee, as executrix of the estate of Margaret White, Virginia T. Frazier, and Mary W. McMahon entered into a contract for sale of Parcel 46 to Oriskany, Inc. ("Oriskany").[36]   Kee concurrently entered into a contract to sell Parcel 44 to Oriskany.[37]   Oriskany thereafter undertook efforts to develop a community of forty-nine homes called "Sweetwater Point," including retaining legal counsel, land surveyors, engineers, and land planners, as well as preparing construction plans and seeking County and State approval for subdivisions, roads, and utilities.[38]   At some point, Oriskany assigned its contract rights to Sweetwater, which then arranged for mortgage financing from Lehman Brothers Holding Inc. ("Lehman").[39]

Throughout the initial planning stages leading up to closing, Sweetwater sought approval from various State agencies for its proposed development, including DNREC and the Delaware Department of Transportation ("DelDOT").

---

[34] *Id.* at 1470:11–19 (Lingo).
[35] *Id.* at 202:2–9 (Vickers).
[36] Stip 38.
[37] *Id.* at 39.
[38] *Id.*
[39] *Id.*  R.I.P.

13

On August 1, 2005, the State sent a letter from Robert Line, of DNREC's Office of Nature Preserves (the "2005 Line Letter") to an environmental engineering firm doing work for Sweetwater's land planner.[40] This letter indicated that the "exact boundary" between the Nature Preserve and the proposed development "has been in dispute (Ron Vickers, per. comm.)," which dispute "must be resolved before you can proceed further."[41] The parties stipulate that this was the first time the State asserted a claim to Parcel 46,[42] though it is not clear from the letter whether the State was asserting a claim to the entirety of Parcel 46 or only a portion of it.

On September 16, 2005, Peter O'Rourke, President of Oriskany, and Ken Christenbury, a licensed Delaware engineer retained by O'Rourke, met with Connie Holland of the State Planning Office to discuss environmental planning for the development.[43] Holland presented a map showing State-owned properties in the vicinity, which appeared to affect a portion of Sweetwater's development plan; she suggested the developer meet with Vickers.[44] O'Rourke met with Vickers thereafter, at which point, per O'Rourke, "Vickers suggested that the State had interest in that area and that they might own something out there," but that "there was no survey" or deed, or anything else, "that would substantiate a claim that the State, indeed, had

---

[40] JX 123.
[41] *Id.*
[42] Stip 39. The State did not notify Sussex County that it claimed title to Parcel 46 until 2006.
[43] Trial Tr. 1099–1100 (Christenbury); *id.* at 1297–98, 1329 (O'Rourke).
[44] *Id.* at 1299–300 (O'Rourke).

14

an outright claim on the property."[45] Ultimately, O'Rourke testified, after repeated attempts to "understand what exactly the State's claim was," Vickers produced a map showing that the State was claiming a portion of Parcel 46, in the northeastern part of the parcel—which was less than was shown on the Nature Preserve Drawing—that would have affected Sweetwater's development plan minimally.[46] O'Rourke testified that this sketch, reproduced as Exhibit D to this Memorandum Opinion, was the only document provided by the State at that time showing the nature of the boundary dispute.[47]

Meanwhile, Sweetwater's surveyor, Chuck Adams, had repeatedly attempted to confirm with the State the extent of its claims, if any, to the area in question.[48] In response, Adams eventually received a file of materials from the State in September or October of 2005, in which he found a copy of the Articles of Dedication for the Nature Preserve, including the Nature Preserve Drawing, and the 1931 Matthews Deed.[49] Adams verified that a sealed copy of the Nature Preserve Drawing was in

---

[45] *Id.* at 1301:1–12 (O'Rourke).

[46] *See id.* at 1303:16–1304:16 (O'Rourke); *id.* at 1339:9–24 (O'Rourke); JX 118; s*ee also* Trial Tr. 1102:7–1104:6 (Christenbury) (identifying the map contained within JX 118 as "the only document I ever saw that was described to me by Mr. O'Rourke as the contested lands according to the State").

[47] Trial Tr. 1304:21–1305:12 (O'Rourke).

[48] *Id.* at 310–11 (Adams). Kee hired Adams of Adams-Kemp Surveyors, a licensed Delaware surveyor, to complete survey work and create a legal description of Parcels 44 and 46; s*ee id.* at 259, 310–311.

[49] *Id.* at 295–98 (Adams); s*ee also id.* at 1332:19–1333:15 (O'Rourke).

fact recorded with the Sussex County Recorder of Deeds.[50] When James Fuqua, Sweetwater's attorney, received this information from Adams, he concluded that, the Nature Preserve Drawing notwithstanding, the Nature Preserve covered only Parcel 8, to the north of Parcel 46.[51]

Sweetwater closed on Parcels 44 and 46 on November 4, 2005.[52] Title insurance was issued without exception for the State's claims; the parties stipulate that the issuing agent for the title insurer did not know about the 1931 Matthews Deed, the Nature Preserve, or the 2005 Line Letter when he issued the policies on Parcel 46.[53] Both the State and the County accepted payments, totaling over $80,000, in transfer taxes associated with the sale.[54]

Following closing, Sweetwater continued its process of obtaining necessary permits for the planned development. By October 2006, Sweetwater had received all necessary approvals except for a DelDOT permit to construct an entrance on Parcel 44.[55] On October 12, 2006, Sweetwater's development proposal was presented at a public hearing of Sussex County's Planning and Zoning division

---

[50] *Id.* at 298:10–16 (Adams).
[51] *See id.* at 1177:2–1180:7 (Fuqua); Stip 39.
[52] Stip 40.
[53] *See id.* at 40–41. Kee also testified that she purchased Parcel 44 because Parcel 46 was otherwise inaccessible, and that she would not have purchased Parcel 44 had she known about the Nature Preserve or any other basis for the State's claim to Parcel 46. *See* Trial Tr. 1422:19–1423:23 (Kee); *id.* at 1458:6–10 (Kee).
[54] Stip 41.
[55] *See* Trial Tr. 1122–25 (Christenbury).

("Planning and Zoning"), at which no objectors appeared.[56] That same day, however, Eileen Butler of DNREC's Division of Parks and Recreation sent a letter to Lawrence Lank, of Planning and Zoning, indicating that DNREC "formally recognize[d] that there is a significant boundary dispute between the developer of Sweetwater Point and the State of Delaware."[57]

Meanwhile, to prepare to market lots in Sweetwater Point, O'Rourke began clearing Parcel 46 of fallen trees.[58] This activity prompted the State to threaten to seek injunctive relief unless the clearing was halted, and Sweetwater agreed to suspend the clearing while the parties' counsel conferred.[59] O'Rourke, Fuqua, and others met with John Hughes, a representative of DelDOT, to discuss the delay in obtaining approval to construct an entrance at Parcel 44.[60] DelDOT advised O'Rourke and Fuqua of the State's tentative plans to construct a highway bypass of downtown Millsboro over land including Parcel 46.[61] The parties reconvened with DelDOT on several other occasions. On April 4, 2007, Christenbury received an email from Butler "on behalf of Ron Vickers," requesting a meeting "to discuss

---

[56] *See id.* at 1119–20 (Christenbury); I take judicial notice of the publicly available minutes of the Sussex County Planning and Zoning Commission for October 12, 2006, available at https://www. sussexcountyde.gov/sites/default/files/minutes/pz10122006.pdf. *See also* Trial Tr. 1119:12–1120:21 (Christenbury).
[57] JX 124.
[58] Trial Tr. 1315 (O'Rourke).
[59] *Id.* at 1318–19 (O'Rourke).
[60] *Id.* at 1319–20 (O'Rourke).
[61] *Id.*

17

boundary issues associated with Sweetwater Point."[62] Other contacts among the parties, logically, must have followed but do not clearly appear in the record.

Ultimately, in 2009, the State filed this action to quiet its claim of title to Parcel 46 and a portion of Parcel 44 against Sweetwater.[63] Sweetwater and Lehman counterclaimed, seeking confirmation of their title and damages. The State subsequently amended its petition to remove any claim to Parcel 44. I held a ten-day trial in September and November 2014, following which the parties completed post-trial briefing. The record was thereafter reopened for additional evidence, newly discovered. I then held oral argument on that new evidence and supplemental briefing by the parties was completed on June 17, 2016. On September 30, 2016, in the interest of efficiency, I released a draft of the portion of this Memorandum Opinion dealing with record title, inviting the parties to point out any mistakes of law or fact that may have arisen from my review of the extensive record. The parties submitted further supplemental informal memoranda on this issue and submitted this matter for final decision on February 9, 2017. This is my post-trial Memorandum Opinion.[64]

---

[62] *Id.* at 1128–29 (Christenbury).

[63] Though initially styled as a quiet title action, both parties concede that this case has been prosecuted and defended as a determination of superior title, without the universal application of an *in rem* quiet title action.

[64] The parties agreed to bifurcate the proceedings in this matter; accordingly, this Memorandum Opinion only addresses who, as between the parties, holds superior title to Parcel 46. The parties have reserved for a later phase of litigation a determination of any remedies.

## III. RECORD TITLE

*A. Evidentiary Standard*

In this action to determine which of the two competing parties has a superior claim—that is, which should prevail in this *in personam* action between the State and Sweetwater—the parties agree that the applicable evidentiary standard is proof by a preponderance of the evidence.[65]  A true *in rem* quiet title action, by contrast, would require proof by clear and convincing evidence.

Each party must establish the strength of its own title first, rather than relying solely on flaws in the competing chain of title.[66]  Sweetwater's argument is heavily focused on calling into question nearly every facet of the State's chain of title, while doing less in the way of advancing its own, which is understandable in light of the "floating" nature of its source deed.  I have no doubt that Sweetwater's late-20th century predecessors-in-title held deeds clearly intended to convey title to Parcel 46, but of course one may convey only what she owns,[67] and Sweetwater's relative inability to establish the strength of its earlier predecessors' title, taken together with

---

[65] *See, e.g.*, Post-Trial Oral Arg. Tr. 5:4–6:4; 10:10–13; *see also* 74 C.J.S. Quieting Title § 79.

[66] *See* Respts' Opening Post-Trial Br. 6 ("The State cannot rely upon any alleged weakness in Sweetwater's title, but must prevail on the strength of its own alleged title.") (citing *Marvel v. Barley Mill Road Homes, Inc.*, 104 A.2d 908, 911 (Del. Ch. 1954)); *see also Smith v. Smith*, 622 A.2d 642, 646 (Del. 1993); 65 Am. Jur. 2d *Quieting Title* § 74."); Petr's Opening Post-Trial Br. 1 ("In any Quiet Title action, the Petitioner has the initial burden to prove its superior title to the land before challenging the respondent's title claims.").

[67] *See, e.g.*, *Scureman v. Judge*, 626 A.2d 5, 16 (Del. Ch. 1992) ("A grantor can convey only such title and interest in land that he actually owns.") (citation omitted).

the plausibility of the State's title, convinces me that, by a preponderance of the evidence as between these parties, the State holds record title to Parcel 46.[68]

*B. General Principles*

In considering the parties' competing chains of title, both of which are colorable, but neither of which is manifest, I am guided by a number of generally applicable principles governing interpretation of deeds. As a general matter, the guiding principle in interpreting the language used in a conveyance is to determine, as closely as possible, the grantor's intent.[69]

In interpreting deed language, there is a general order of priority by which I am to consider various identifying factors: calls to natural monuments take the first priority, then to artificial monuments, then to courses of distances, then to acreage.[70] Calls to adjoiners are akin to calls to artificial monuments.[71] Of course, this priority is not absolute; rather, it is a tool used to arrive at the grantor's intent—the controlling consideration in any determination of conveyances.[72]

---

[68] The parties expressed at post-trial oral argument their desire for me to settle this dispute as between these two parties. That is the narrow scope of my decision, and, as a result, I am tasked with deciding which chain of title *more plausibly* includes Parcel 46, solely as between the State and Sweetwater.

[69] *Smith*, 622 A.2d at 646 ("The fundamental rule in construing a deed is to ascertain and give effect to the intent of the parties as reflected in the language they selected.") (citation omitted); *Maciey v. Woods*, 154 A.2d 901, 904 (Del. 1959) ("[T]he fundamental function of rules of construction is to determine the intention of the parties.").

[70] *See, e.g.*, 4 Tiffany Real Prop. § 993 (3d ed.).

[71] *Id.*

[72] *Id.*

20

The primary difficulty here is that the chains of title proposed diverged long ago, with respect to property that has for much of history been undisturbed woodland. Many of the relevant deeds in this case are old and, on their face, not clear; I am thus aided by extensive extrinsic evidence.[73] As *Tiffany Real Property* notes, excepting only

> the broad principle that a conveyance will not be declared void for insufficiency in its description of the property which it purports to convey, if it is possible by *any* reasonable rule of construction, aided by extrinsic evidence, to identify the property intended, it is impossible to give any general rules by which to determine whether, in the case of any particular conveyance, the description is sufficiently definite to render the instrument operative.[74]

With these general principles in mind, I turn to the State's chain of title.

*C. The State's Chain of Title*[75]

The record makes it clear that the State was unaware of its interest in Parcel 46 until late in the day. As discussed in the Background Facts, in 1991, the Articles of Dedication for the State's Nature Preserve identified only Parcel 8, despite the accompanying plot showing that the Preserve includes part of Parcel 46. In fact, the State twice considered a purchase of Parcel 46 from Sweetwater's predecessors-in-interest. Since the latter part of the 20th century, it has allowed others to post the

---

[73] The vigor exhibited by counsel to develop the record, involving tracing titles and land use of the area north of Millsboro Mill Pond back to colonial times, has been extraordinary.

[74] 4 Tiffany Real Prop § 997 (3d ed.) (emphasis added).

[75] In reviewing this discussion of the parties' chains of title, the reader will be aided by reference to Figures 1 and 2, attached as Exhibit E.

property against trespassers, and has taken no action itself against trespassers on Parcel 46, despite its careful patrolling of adjacent Parcel 8, on the Stockley Center grounds, to prevent trespass. It allowed the timber on Parcel 46 to be cut and removed, without protest. Were two private parties involved in this contest, as I have explained above, this would be a likely case for the application of adverse possession, and this Memorandum Opinion would be far shorter. As discussed above, however, and as referred to below in my discussion of equitable defenses raised by Sweetwater, for periods relevant here the State has exempted itself from the salutary rigors of the application of adverse possession; thus, my resolution of the issue requires weary examination of the competing chains of title. Upon that review, as laid out below, I find by a preponderance of the evidence that, as between these claimants, the State holds record title to Parcel 46.

### 1. The State's Source Deed: The 1931 Matthews Deed

I begin with the State's purported source deed, a 1931 deed transferring property from Wingate E. Matthews and Lizzie A. Matthews to the State (the "1931 Matthews Deed").[76] This deed is poorly drafted and requires much interpretation and application of extrinsic evidence, and the parties have heavily litigated its meaning, including whether it purports to transfer title to Parcel 46. If it does not,

---

[76] JX 1.

22

the State's claim must fail; the intent to transfer title to Parcel 46 by the Matthews

Deed to the State is a necessary but not sufficient predicate for a finding of title.  For

the reasons below, I find that the 1931 Matthews Deed evinces an intent to convey

title to Parcel 46 to the State.

The calls in the deed are as follow:

Beginning at a cedar stake, corner for the lands of the State of Delaware, known as Delaware Colony, lands of Able Ableman, and these lands, thence, south thirty-five degrees west twenty-two and six tenths perches to a cedar post in the center of Mirey Branch; thence, with the run of the said branch and meanderings thereof to the Doe Bridge Mill property; thence, with said Doe Bridge Mill property north thirty-three and one-quarter degrees west twelve perches to Doe Bridge pond; thence, with said pond, and meanderings thereof, to the lands of the State of Delaware known as Delaware Colony; thence with three lines of same south seven degrees west seventy-six perches to a large White Oak; thence, eighteen and three-fourths degrees east fifty and three tenths perches to a cedar post, thence, south thirty five degrees west nine and one-tenth perches to the place of beginning, containing one hundred acres, more or less . . . .[77]

The State acknowledges that the metes and bounds description just recited is

problematic, but argues that the 1931 Matthews Deed nonetheless evinces an intent

to convey Parcel 46, despite its flaws.  Sweetwater contends that the State's 1931

Matthews Deed is "unclear and ambiguous"[78] and can only include Parcel 46 in its

entirety if "the Court accepts the State's invitation to rewrite the legal description on

---

[77] *Id.*
[78] Respts' Pre-Trial Memorandum 4.

23

which the State relies."[79]  The 1931 Matthews Deed covers approximately 100 acres, but the parties dispute the location of those 100 acres; it is undisputed that *some* portion of the 100 acres of land conveyed by the 1931 Matthews Deed is north of the Doe Bridge Road, and Sweetwater contends that it must be *entirely* north of the Road, and thus does not include Parcel 46, for which the road is the northern boundary.  That contention, in part, is based on the adjacent, now mostly drained, pond bottom (the "Pond Bottom") of the old Doe Bridge Mill ponds; Sweetwater relies on an assumption that the 1931 Matthews Deed conveyed the Pond Bottom, which together with the acreage north of the Road, comprises the entire property transferred.  If the 1931 Matthews Deed included the acreage of the Pond Bottom, Sweetwater's contention—that the deed references only lands north of the Road, and not Parcel 46—is plausible.

Sweetwater argues that the following reformations are necessary before the 1931 Matthews Deed can be read to include the land identified as Parcel 46:

> (i) an extension of the grossly short measurement recited as the distance between the erroneously defined beginning point in the State's Deed and a cedar stake (which cannot be found) in the Mirey Branch; (ii) an extension of unspecified distance running from a non-existent cedar stake in the Mirey Branch to the unmentioned mouth or terminus of the Mirey Branch, where it discharges into Millsboro Pond; (iii) a "missing call" to Millsboro Pond, running from the unspecified mouth or terminus of the Mirey Branch along the waters of Millsboro Pond, which border the peninsula of Parcel 46, until it meets the Cow Bridge

---

[79] *Id.*

24

Branch; and (iv) a "missing call" running from the mouth of the Cow Bridge Branch, where it meets Millsboro Pond, to the undefined Doe Bridge Mill Property.[80]

The State, by contrast, characterizes any errors in the 1931 Matthews Deed as "*de minimis*" and not affecting an interpretation of the parties' intent.[81] In reviewing the deed, I do not find it to be as defective as Sweetwater suggests. I address each call in turn.

### a. First Call

The first call, which provides the western border of the property, reads: "[b]eginning at a cedar stake, corner for the lands of the State of Delaware, known as Delaware Colony, lands of Able Ableman, and these lands, thence, south thirty-five degrees west twenty-two and six tenths perches to a cedar post in the center of Mirey Branch."[82] Sweetwater argues that I must extend a grossly short distance call in order to reach the center of the Mirey Branch to a cedar post no longer in existence. However, it is well settled that natural monuments take priority over distances, and I apply that priority here.

---

[80] *Id.*

[81] *See* Petr's Pre-Trial Memorandum 3.

[82] JX 1.

b. Second Call

The second call, starting in the Mirey Branch, reads: "thence, with the run of the said branch and meanderings thereof to the Doe Bridge Mill Property."[83] A glance at the map in Exhibit A shows the problem: the Mirey never reaches, via meander or otherwise, the Doe Bridge Mill Property, which is located *not* on the Mirey Branch but on the Cow Bridge Branch (aka Doe Bridge Branch) at or near its discharge into Millsboro Pond. The denomination of these streams as "branches" is explained by the fact that Millsboro Pond is itself a millpond, an artificial, although ancient, impoundment of Indian River; and that the Doe Bridge Branch and the Mirey Branch together formed Indian River, at their confluence, in its natural state. Thus, with reference to the call "with [the Mirey] . . . to the Doe Bridge Mill Property," Sweetwater argues that the deed is missing calls to the Millsboro Pond and/or Cow Bridge Branch to the southeast and east of Parcel 46.[84] I note that following the meanderings of the waterway tracing around the Boot does lead to the

_____

[83] *Id.*

[84] In an apparent attempt to plot this call, the creator of the Nature Preserve Drawing showed a line cutting across the Boot of Parcel 46. However, I find the more logical approach to be to follow along the edge of the land, from the call to the Mirey, to the Doe Bridge Mill Property, which I find to mean the remains of the earthen dam. Site visits made clear to me that the dam was, at least on the western portion adjacent to Parcel 46, a dirt structure made by digging from the high ground on Parcel 46—the borrow pits resulting from such digging are still clearly visible in person—and extending from Parcel 46 in an easterly direction across the Cow Bridge Branch toward the Indian River Hundred side. The topography of the dam is noticeably different from the natural portions of the land—the dam remains are a narrow, level piece of ground attached to upland on the west side of the Cow Bridge Branch. This portion of the "land" is *not* Parcel 46; rather, it is the Doe Bridge Mill Dam.

26

Doe Bridge Mill Property. I recognize, of course, that the Mirey itself does not extend *around* the Boot, but the Mirey also does not have a defined terminus into the Millsboro Pond,[85] which itself is not clearly distinguishable from the Cow Bridge Branch. I find that the most reasonable interpretation of this call—in light of my understanding as to the nature of the dam remnants as adjacent to the natural portion of Parcel 46, together with the use of the term "meanderings"—is that it is meant to trace the waterway along the edge of the Boot. A property line following the bank leads to the Doe Bridge Mill Property. This approach best effectuates the intent set forth in the 1931 Matthews Deed, and is consistent with the deeds in to Matthews and with adjoining properties, as will be discussed below.

### c. Third and Fourth Calls

The third and fourth calls, forming the eastern and part of the northern boundary, read: "thence, with said Doe Bridge Mill Property north thirty-three and one-quarter degrees west twelve perches to Doe Bridge pond; thence, with said pond, and meanderings thereof, to the lands of the State of Delaware known as Delaware Colony."[86] The State argues that the call to travel with the "pond" refers to the western *edge* of the pond; in other words, the State contends that the property conveyed by the 1931 Matthews Deed does *not* include the Pond Bottom.

---

[85] Sweetwater's surveyor expert, Adams, testified at trial that the Mirey extends along the entire southern portion of Parcels 44 and 46. *See* Trial Tr. 266:10–12 (Adams).
[86] JX 1.

27

Sweetwater argues the opposite, that "with the pond" either indicates the east side of the pond (where the Doe Bridge Mill itself appears to have been located), or means the centerline or the meanderings of the drowned branch, in either case including some or all of the Pond Bottom.[87]

Resolution of this dispute—whether the 1931 Matthews Deed was intended to convey the Pond Bottom—is an important component to my finding that the Deed included Parcel 46. Again, Sweetwater contends that, if the 1931 Matthews Deed includes title to a significant portion of the Pond Bottom, the 100 acres called for in that deed would have to be located north of the Road, thus not including Parcel 46. If, however, the Pond Bottom acreage is excluded, then the portion of the deeded property above the Road would total only some forty-five acres, leaving approximately fifty-five acres that must fall south of the Road, which the State contends would be Parcel 46.[88] I find, as discussed below, that the 1931 Matthews Deed did *not* include the Pond Bottom, as the evidence persuades me that Matthews did not own the Pond Bottom. In light of this finding, I find by a preponderance of the evidence that the 1931 Matthews Deed conveyed Parcel 46 to the State. Explaining this finding requires examination of the ownership of the Doe Bridge

---

[87] Sweetwater initially argued that the call to the Doe Bridge Mill Property necessarily located the line on the east side of the Branch, as the Mill itself was east of the run of the Branch. Evidence in the record indicates that portions of the Doe Bridge Mill Property, including portions of the dam itself and a "mill lot," were *west* of the Cow Bridge Branch. This evidence is addressed, *infra*.
[88] I note that Parcel 46 is, in fact, sixty-three acres.

Mill Property and the associated flooded lands which were covered by the Doe Bridge ponds.[89]

## 2. Conveyance of the Doe Bridge Mill Property

The State owns the Doe Bridge Mill Property adjacent to the lands in question here. At trial, the State traced ownership of the Doe Bridge Mill Property, which it purchased in 1933, to a source deed issued in 1864. Following trial, I asked the parties to supplement the record with a copy of an 1829 private legislative act (the "1829 Act"), which authorized a miller, Robert Frame, to construct (or reconstruct) the Doe Bridge Mill Dam. Through this and additional evidence provided by the parties, the State is now able to trace ownership of the Doe Bridge Mill Property from a legislative act of 1829 up to its prior source deed of 1864. Sweetwater contends that these new chains of title upon which the State relies only conveyed *riparian* rights, and not rights to the Doe Bridge Mill ponds in fee simple. As Sweetwater points out, ownership of a mill and dam is presumed to include riparian rights to the dammed water, but not the fee to the land so submerged.[90] That presumption, of course, is rebuttable.[91] Here, all of the evidence, viewed as a whole,

---

[89] I note, but do not rely on, field visits that indicate that the Doe Bridge Mill Dam, due to local topography, appears to have flooded two relatively distinct areas above the dam—that is, ponds rather than a single pond—connected by a relatively narrow channel of the drowned Cow Bridge Branch.

[90] *Elwood Workman & Sons v. Smith*, 2002 WL 31458239, at *2 (Del. Ch. Oct. 15, 2002).

[91] *Id.*

convinces me that it is more likely than not that the 1829 Act and deed *did* convey

the Pond Bottom; that, therefore, the Matthews Deed did not include the same; and

that the Matthews Deed therefore meant to convey Parcel 46. I note that I need not

find here whether *in fact* the Act conveyed the fee, in order to determine title to

Parcel 46 as a matter of law; the likely effect of the 1829 Act is merely *evidence* that

Matthews did not intend to convey the pond bottom to the State.

In 1933, Andrew and Catherine Lynch conveyed the Doe Bridge Mill

Property to the State of Delaware (the "1933 DBM Deed"). The conveyance reads

as follows:

> All that certain tract, piece and parcel of land, situate, lying and being
> in Dagsboro and Indian River Hundred, Sussex County, Delaware . . .
> all the land which lies to the southward of a straight line drawn from a
> line started at the forks of the public road leading from Millsboro to the
> Henry Frame Farm, and a road leading from the aforesaid public road
> down to the old site of "Doe Bridge Mill" in a northwesternly direction
> across a road to a poplar, and *thence following the high water mark*
> *around the Old Doe Bridge Mill Pond so as to include the site of the*
> *old mill known as "Doe Bridge," together with the mill stream, mill*
> *dam, mill-pond and all streams* and pond privileges and all rights
> pertaining to the said Doe Bridge Mill, containing seven (7) acres be
> the same more or less.[92]

I read the 1933 DBM Deed as intending to convey the Pond Bottom together with

the uplands containing the Mill. It is hardly likely that the Lynches would have

---

[92] JX 59 (emphasis added).

30

retained the Pond Bottom while selling the Mill. Again, the question is whether the Lynches owned the property they attempted to convey.

A series of deeds dating back to 1864 constitute the chain of title for the Doe Bridge Mill Property.[93] Sweetwater contends that these deeds describing the Doe Bridge Mill Property "included only water rights—not fee title,"[94] while the State contends that these deeds conveyed the Pond Bottom in fee simple, such that the Matthews Deed must have excluded this land and, therefore, included Parcel 46.

The 1864 deed in to Benjamin B. Jones from Robert Morris of L. and William L. Morris and his wife, describe the conveyance of

> all of that certain Grist Mill and Carding Machine Situated laying and being in Dagsboro Hundred and Indian River Hundreds in Sussex County and State of Delaware Together with the Mill Stream or pond, Mill dam[,] Mill lot of land and dwelling House thereon Containing in the whole under water and out of water Ten acres to be the same more or less [indecipherable] called and known by the name of Doe Bridge Mill.[95]

The executor for the estate of Benjamin B. Jones described the next conveyance as "[a]ll that certain Grist Mill, Mill Stream, Mill Dam, Mill lot and dwelling thereon, situate in Dagsboro and Indian River Hundreds on [indecipherable] Branch, called and known by the name of [D]oe Bridge Mills, containing in the whole under water

---

[93] *See* JX 68; JX 67; JX 66; JX 65; JX 64; JX 63; JX 62.
[94] Respts' Opening Post-Trial Br. 34 n.22.
[95] JX 68.

31

and out, 10 acres, more or less."[96]  The Estate of Benjamin B. Jones also conveyed another five-acre parcel of land "adjoining the Doe Bridge Mill Lot and Henry C. Frame."[97]  These two parcels can be traced through deeds of record to the 1933 DBM Deed from Andrew Lynch and Catherine Lynch to the State of Delaware.[98]

The State contends, and I agree, that the conveyance of land "following the high water mark around the Old Doe Bridge Mill Pond so as to include the site of the old mill" in the 1933 DBM Deed is intended to convey the land *underlying* the pond as well, consistent with the depiction shown on a 1957 survey by Albert Korves, which references the 1933 DBM Deed.  The State notes that this conveyance and the deeds preceding it all cite to land in *both* Indian River Hundred and Dagsboro Hundred[99] and argues that the only land on the Dagsboro Hundred side would be "possibly a small portion of land constituting the westerly side of the dam," if the Pond Bottoms are excluded.[100]  I note, however, that the dam and mill lot on the Dagsboro side of the branch would probably explain the reference to both Hundreds, whether or not the Pond Bottom was included.  Nonetheless, as stated above, I reach

---

[96] JX 67.

[97] *Id.*

[98] JX 59.  As noted above, the 1933 DBM Deed recites seven acres; the predecessor deeds recite ten.  Quantity, however, is "the least certain of all the elements of description that are usually found in a deed."  26A C.J.S. Deeds § 254.

[99] Local readers will know, but others may not, that the term "Hundreds" refers to a subdivision of a county.  It was once used in England, Wales and portions of the United States, but apparently persists only in Delaware.

[100] Petr's Post-Trial Answering Br. 14.

the same conclusion as did, apparently, the drafter of the Korves Survey; that based on the language of the deeds each grantor in the chain to the Doe Bridge Mill Property intended to include the land underlying the water.[101]

On the other hand, the "seven or ten" acres referenced is woefully short of the extent of the conveyance if the Pond Bottom is included. A reading of the deed language to indicate that what is conveyed is "the whole under water"—that is, including the Pond Bottom—"and out, ten (or seven) acres"—meaning ten (or seven) acres of upland, exclusive of the Pond Bottom, is speculative and, frankly, strained. However, my finding that the Pond Bottom was owned by the owner of the Mill, and thus did not form a portion of the lands described in the 1931 Matthews Deed, is, to my mind, strongly bolstered by review of the parties' supplemental submissions regarding the 1829 Act.

The 1829 Act authorized Robert Frame to construct the Doe Bridge Mill Dam.[102] The Act stated that it "shall forever vest in and convey to the said Robert Frame, his heirs and assigns, a good and indefeasible title and estate in fee simple to and in the aforesaid lot of lands and all and every uplands, low ground and cripple in said plot . . . ."[103] Significantly, the 1829 Act allowed Robert Frame to rebuild his

---

[101] At least, in light of the unusual posture of this case, I find this to be more likely the conclusion than the alternative.

[102] S-JX-3A, Tab. 3A.

[103] S-JX-3A, Tab. 3A at 4.

ancestor's "ancient mill" and milldam, and required a damages proceeding, in which five freeholders were charged with assessing the owners of the lands to be flooded and the "value" and "damages" of the land so condemned. Also of note, the Act included a writ under which the Court of Common Pleas was charged with determining Frame's *existing* rights, arising with respect to the operation of the "ancient mill" through condemnation or otherwise, which would allow him to avoid paying some or all of the damages. Upon the return of such writ, the Act provided that the survey of the freeholders was to be "filed of record . . . and shall forever vest in and convey to the said Robert Frame, his heirs and assigns . . . title . . . in fee simple" to the mill lot and "all and every the uplands, low ground and cripple" described therein, conditioned upon payment of the condemnation damages awarded. The survey[104] shows the lands to be flooded, which correspond to the area which on a site visit appears to be formerly-flooded bottom today.[105]

As per the 1829 Act, the Court of Common Pleas conducted a damages proceeding which identified three individuals whose land would be "overflowed and drowned" by the construction of the dam.[106] Following the completion of

---

[104] JX 159. The enrolled bill comprising the 1829 Act is in the record.
[105] Sweetwater points out that the record is silent as to whether the damages were ever paid, and thus argues I should assume they were not, and secondarily assume that the fee was never transferred. I do not find such an assumption compelling, in light of all the facts here.
[106] *See* JX 69.

34

proceedings in the Court of Common Pleas as commanded by the 1829 Act,[107] title to the property referenced (the "Frame Property") was conveyed to Robert Frame.[108] That proceeding was followed by a conveyance of the Frame Property to William D. Waples, Robert Morris of L., and Derick Barnard.[109]  These individuals were parties to a deed (the "Frame Deed") conveying to them "all and every benefit and advantage of an Act of the General Assembly," that is, the 1829 Act.[110]  They took the Frame Property as tenants in common.[111]  Their interests in the Frame Property in turn passed through several transactions, described below, to Benjamin B. Jones whose deed can be directly traced forward to the 1933 conveyance of the Doe Bridge Mill Property to the State.[112]

William Waples's one-third interest in the Frame Property passed to William Waples's widow, Rachael Waples, upon his death and was assessed to her in the 1844 assessment.[113]  That one-third interest was conveyed to Theodore Marvel by two deeds, one from William Waples's Estate in 1853 and one from Rachael Waples

---

[107] S-JX-3A, Tab. 3A.
[108] *See* Petr's Mem. 1829 Act 10–11.
[109] S-JX 19A; The names of the individuals receiving the property were identified by tax assessments to the three individuals as well as through the Frame Deed property description. William Waples was assessed 1/3 of a grist mill at Doe Bridge in 1836 (S-JX 9) and Derrick Barnard's heirs were assessed 1/3 of Doe Bridge Mill in 1844 (S-JX 13).
[110] S-JX 19A.
[111] *Id.* at 19A, Tab. 8A.
[112] *See* JX 59–JX 68.
[113] S-JX 11.

in 1854.[114]  Rachael Waples's deed out included specifically "all . . . the ways, waters, water course, rights, liberties, privileges, hereditaments and appurtenances whatsoever thereunto belonging or in anywise appertaining and . . . rents issues . . . thereof and all the estate right title interest property claim . . . ."[115]  Marvel, less than one month later, conveyed his interests in the mill "[t]ogether with all . . . waters, watercourses, right, liberties, and privileges . . . appurtenances whatsoever thereunto belonging or in any wise appertaining" to Robert Morris of L.[116]  By this time, as discussed above, Robert Morris of L. already owned another one-third interest in the mill as acquired in the Frame Deed of 1829.

Derick Barnard's one-third interest passed to his heirs who were assessed as owners of "1/3 Doe bridge Mill" in 1844.[117]  The interest was sold by the administrator of Barnard's Estate on July 18, 1853.[118]  The deed stated the conveyance of Barnard's "one undivided third of the Mills lands and premises known as Doe Bridge Mills . . . and appurtenances situate in Dagsboro & Indian River Hundreds" to George Barnard and Thomas A. Fithian.[119]  This interest was then conveyed to William Morris of Robert ("William Morris") by deed.[120]  That

---

[114] S-JX 24A–25A.
[115] S-JX 24A.
[116] S-JX 27A.
[117] S-JX 13.
[118] S-JX 23A.
[119] *Id.*
[120] S-JX 26A.

deed described the interest as "the undivided third part of a certain grist mill and carding machine situate, lying and being in Dagsboro and Indian River Hundred . . . together with the same share of the Mill dam mill pond lot of land and dwelling house containing in the whole under Water and out of water 10 acres more or less on Cow [Bridge] branch called Doe Bridge Mills also."[121]  In 1864, William Morris conveyed his interest in the mill "[t]ogether with the mill stream or pond, mill dam, mill lot of land and dwelling house thereon" "[c]ontaining in the whole under water and out of water ten acres" to Benjamin Jones.[122]

Robert Morris of L., as explained above, acquired an original one-third interest through the Frame Deed.[123]  He additionally obtained, in 1853, the one-third interest originally given to William Waples thus owning a two-thirds interest in the Frame Property.  In 1864, the entire Doe Bridge Mill Property was conveyed by deed to Benjamin B. Jones from Robert Morris of L. and William L. Morris and his wife as

> all of that certain Grist Mill and Carding Machine Situated and laying and being in Dagsboro Hundred and Indian River Hundreds in Sussex County and State of Delaware Together with the Mill Stream or pond, Mill dam[,] Mill lot of land and dwelling House thereon Containing in the whole under water and out of water Ten acres to be the same more or less [indecipherable] called and known by the name of Doe Bridge Mill.[124]

---

[121] S-JX 26A.
[122] JX 68.
[123] S-JX 19A.
[124] JX 68.

The executor for the Estate of Benjamin B. Jones later described the property as "[a]ll that certain Grist Mill, Mill Stream, Mill Dam, Mill lot and dwelling thereon, situate in Dagsboro and Indian River Hundreds on [indecipherable] Branch, called and known by the name of [D]oe Bridge Mills, containing in the whole under water and out, 10 acres, more or less."[125] The Estate of Benjamin B. Jones also conveyed another five-acre parcel of land "adjoining the Doe Bridge Mill Lot and Henry C. Frame."[126] These two parcels can be traced to a 1893 deed,[127] a 1904 deed,[128] a February 1917 deed,[129] a July 1917 deed,[130] an October 1917 deed,[131] a 1919 deed,[132] a 1930 deed,[133] and, finally, the 1933 deed from Andrew Lynch and Catherine Lynch to the State of Delaware.[134]

As a consequence, I find that the Doe Bridge Mill Property, now owned by the State, likely included the fee to the Pond Bottom, as conveyed to Frame by the 1829 Act, the resulting Court of Common Pleas action and the deeds referenced above. It is unlikely, therefore, that the parties to the 1931 Matthews Deed intended

---

[125] JX 67.
[126] *Id.*
[127] JX 66.
[128] JX 65.
[129] JX 64.
[130] JX 63.
[131] JX 62.
[132] JX 61.
[133] JX 60.
[134] JX 59. As to the quantum of land cited, *see supra* note 100 and accompanying text.

the 100 acres conveyed therein to include the Pond Bottom. I find, consequently, that the intent of the parties in the 1931 Matthews Deed was to convey, *inter alia*, all of Parcel 46 as part of the 100 Acres conveyed.[135]

Having determined, through an examination of the metes and bounds description, and examination of extrinsic evidence, that the State has demonstrated that the 1931 Matthews Deed purports to convey title to the lands in dispute, I turn to the State's evidence that Matthews in fact had title to what is now Parcel 46, at the time of the deed.

### 3. 1931 Matthews Deed—Chain of Title, "Dry Boots"

In 1776, property between the branches of Indian River, referred to as "Dry Boots" (presumably because it was higher than most adjoining property) was conveyed to Smith Frame by a Property Warrant.[136] The parties agree that this property included Parcel 46.[137] This property was then left by will to Nathan Frame in 1786.[138] Nathan Frame then sold Dry Boots to Lacey Morris in 1802.[139]

---

[135] While Wingate Matthews also owned property above the Road, this property was not sufficient to have conveyed one-hundred acres to the State; the sixty-three acres contained in Parcel 46 are necessary to provide for the proper acreage.

[136] JX 17; JX 18.

[137] *See* Petr's Post-Trial Opening Br. 28; Respts' Post-Trial Reply Br. 8.

[138] JX 16.

[139] JX 15. At the time he sold Dry Boots to Lacey Morris, Nathan Frame also conveyed "part of Nath Wapels Reserve of 1796," which together comprised 236 acres including 180 acres of arable land. While Sweetwater claims the unexplained discrepancy between these 236 acres and the 100 acres purchased by T.S. Johnson indicates that T.S. Johnson may well not have purchased all of Parcel 46 (*See* Respts' Post-Trial Opening Br. 30–31), I find that my later analysis of the chain of

39

Lacey Morris transferred twenty acres[140] of his property to Simon Kollock, who in turn left those twenty acres to his grandson, Smith Wilson.[141] The remainder of Lacey Morris's land, including land "bought of Nathan Frame," passed to his grandchildren, Burton Morris and Hetty Prettyman, upon Lacey's death in 1820.[142]

In 1825, Burton Morris purchased his sister Hetty's interest in the land inherited from their grandfather.[143] In 1829, Burton Morris acquired the twenty acres that had passed to Simon Wilson (the "1829 Wilson Deed") with the effect that Burton Morris then held title to all of the land that his grandfather Lacey had acquired in 1802.[144] The parties agree that the 1829 Wilson Deed in its courses and distances is "sufficiently close" to describe the sixty-three acres in Parcel 46. In other words, the parties agree, and I find, that Burton Morris held title to what is now Parcel 46 in 1829.[145]

Burton Morris died in 1835 and left his land to his widow Patience, who remarried Benjamin Dorey in 1836.[146] At his death, Burton Morris was assessed on

---

title from Burton Morris, who the parties agree held title to all of Parcel 46, to T.S. Johnson establishes the necessary chain by a preponderance of the evidence.

[140] I note that the parties' briefing is inconsistent as to whether this property comprised twenty or forty-five acres. Ultimately, it does not matter to my decision.

[141] Stip 31–32.

[142] JX 14.

[143] JX 13.

[144] JX 12.

[145] Stip 27.

[146] *Id.* at 32.

145 acres.[147]  Following the conveyance by will to Patience, the State contends that the property passed by law to Patience and her new husband, Benjamin.  The record does not contain a deed demonstrating ownership by Patience and Benjamin Dorey of the property containing Parcel 46.[148]  However, Patience and Benjamin did execute a mortgage to Robert Morris of L., Burton Morris's executor and uncle, the language of which indicates a claim of ownership over Burton Morris's lands which the parties agree includes Parcel 46.[149]  The indenture described the land to be mortgaged as follows:

> one tract or parcel of Land called Dry Boots, which land is situated and lying in Dagsboro Hundred, and [Sussex County] and adjoining lands of Robert Morris of L.[,] Simon K. Wilsons [sic], late the property of Burton Morris of [illegible] a part of which he had willed to him by Lacey Morris a part also which he purchased of his sister Hetty Prettyman and a part of Dr. Simon K. Wilson all which has now become to be in tenancy and possession of the aforesaid Benjamin H. Dory and Patience his wife.[150]

Following this claim of ownership, there is again a lack of a deed, will, or other document evidencing the passing of Patience and Benjamin's property.  While there

---

[147] JX 69.

[148] *See* JX 108 at 14.

[149] JX 11; s*ee* JX 108 at 14.

[150] JX 11. The terms of the indenture provided that if Benjamin and Patience did not repay the two hundred dollars loaned to them by 1837, the deed would "remain in full force and virtue both in law and equity," but that if they repaid the sum with interest, the deed would be "utterly null and void." *Id.* The record does not reflect whether this loan was repaid and the deed nullified, but circumstantial evidence regarding John and Mary Dorey's interests in land suggests that title remained vested in Benjamin Dorey.

are discrepancies in the acreage of land assessed to Benjamin Dorey prior to his passing, in 1860 and 1864 he was assessed on one hundred acres[151] and the 1864 assessment shows a notation of "hs" following Benjamin Dorey's name, which presumably designates that the land noted was held by his heirs; additionally, a notation below the 1864 one hundred acre assessment reads, "deduct 60 to T.S. Johnson."[152] That notation is significant, for the reasons below. The record does not reflect when Benjamin Dorey died or the identity of his heirs. However, Patience and Benjamin had two children together, John H. Dorey and Mary Dorey.[153] While there is no conveyance or transfer evidenced to their children, the 1868 assessment does not have an entry for Benjamin Dorey, but does assess Mary Dorey at fifty acres; John Dorey is not assessed on any land, and his name is stricken with the word "Dead" over it.[154]

Based on the relationship between Patience and Benjamin Dorey and John and Mary Dorey as well as the assessment records and conveyances in years

---

[151] JX 128.

[152] *Id.* The State's title expert testified that it was his opinion that the "hs" notation and the notation regarding T.S. Johnson was added after the assessment was made, indicating that, at some time after 1864, Benjamin died and part of his land was transferred to T.S. Johnson.

[153] The 1850 census records show Benjamin and Patience Dorey lived with two males, Benjamin and John, and two females, one named Mary. JX 155; Trial Tr. 798:9–803:15 (Marshall). I find that it is more likely than not that John and Mary were the sole heirs of the lands of Benjamin Dorey (the elder), who got the land from his wife Patience, who in turn had inherited it from her late husband Burton Morris. That is to say, John and Mary Dorey received the lands that had once belonged to Burton Morris.

[154] JX 128; Trial Tr. 796:1–12 (Marshall). I note that the spelling in the assessments varies between "Dorey" and "Dory," but no one has argued that these are not the same people.

following Patience and Benjamin's death, I find it more likely than not that John and Mary Dorey inherited the land of their parents and, thus, the land formerly of Burton Morris which included Parcel 46. The State contends strongly that the doctrine of presumed grant—which exists to prevent failure of otherwise-established title upon a lacuna in the chain—mandates such a finding. While the applicability of the doctrine of presumed grant in this proceeding is not altogether clear, since I have already found it more likely than not that John and Mary Dorey inherited the property, I rely on the doctrine only to provide additional strength to that finding. Contrary to adverse possession, under the doctrine of presumed grant the occupancy of the land is presumed rightful, rather than adverse.[155] As this Court explained in a 1979 decision,

> [t]he net result of these policies is that it is not necessary to believe a conveyance was in fact made in order for the trier of fact to presume a conveyance. If the evidence leads to the conclusion that the conveyance might have been executed, and that its existence would be a solution to the difficulties arising from its non-execution, then this is sufficient to presume a grant.[156]

Based upon the evidence as bolstered by this doctrine, I find that each child of Patience and Benjamin Dorey possessed an undivided one-half interest in their parents' property, as that presumption best explains the record here.

---

[155] *See Phillips*, 449 A.2d at 256 (citing 4 Tiffany Real Prop. § 1136 (3d ed.)).
[156] *State v. Phillips*, 400 A.2d 299, 305 (Del. Ch. 1979) (citations omitted).

43

After the passing of Patience and Benjamin Dorey's property to their heirs John and Mary, the evidence shows that John Dorey left debts upon his death necessitating a sheriff's sale of his property interest, which took place in 1867.[157] John Dorey's property interest was purchased by T.S. Johnson in April 1867 as evidenced by a sheriff's deed (the "1867 Sheriff's Deed") describing property of approximately one hundred acres.[158] However, as stated above, based on the passing of the property from Benjamin Dorey to both children equally, John Dorey only owned an undivided one-half interest in the property which he inherited with his sister. Thus, T.S. Johnson could only purchase that one-half interest in the 1867 Sheriff's Deed. The record indicates that, rather than partitioning their interests, T.S. Johnson and Mary Dorey transacted to separate their interests. This transaction was done through two deeds (the "Exchange Deeds") by which T.S. Johnson and his wife acquired Mary Dorey's interest in sixty acres and Mary Dorey in exchange received an interest in forty-nine acres improved with a single-story dwelling, purportedly located north of the Road. In other words, before the execution of the Exchange Deeds, Mary Dorey, and Johnson (via John Dorey), owned undivided half-interests in one hundred acres more or less of the old Dry Boots patent, both north and south of the Road. Thereafter, Mary owned an undivided interest in the lands north of the

---

[157] *See* Stip 14.
[158] JX 9.

Road, and Johnson the lands to the south, including Parcel 46. Mary Dorey's interest, conveyed in the exchange to T.S. Johnson, names Isaac Burton as an adjoiner to the property.[159] At this juncture the parties again agree, and I find, that the deed from Mary Dorey to T.S. Johnson is "sufficiently close" in its description "to describe land that includes all 63 acres in Parcel 46 on the south side of the Road."[160] Thus, through the Exchange Deeds, T.S. Johnson acquired Parcel 46. This finding is further supported by the 1868 assessment showing the "deduct[ion]" of sixty acres of the land held by Benjamin Dorey's heirs to T.S. Johnson, as well as the assessment of fifty acres to Mary Dorey.

In 1871, Mary Dorey's forty-nine acres were transferred to T.S. Johnson (the "1871 Sheriff's Deed"). The parties agree that these forty-nine acres were situated above the Doe Bridge Mill Road, directly across from Parcel 46.[161] Like the Exchange Deed from Mary Dorey to T.S. Johnson, conveying sixty acres, this deed also called for Isaac Burton as an adjoiner to the land transferred. Sweetwater argues that this demonstrates that Isaac Burton (and not T.S. Johnson) by this point must have owned Parcel 46. If true, this would put Parcel 46 in Sweetwater's chain. For reasons detailed below I find this unlikely. I find it more plausible that this reference

---

[159] JX 7–JX 8.
[160] Stip 27.
[161] *Id.* at 30.

45

to Isaac Burton as an adjoiner was a mistake, probably a scrivener's error perpetuating the reference to Burton as an artifact of the 1867 Exchange Deeds. Accordingly, I find that as of 1867, and through his death, the owner of what is now Parcel 46 was T.S. Johnson.

### 4. T.S. Johnson's Estate

Sweetwater points out that the description of the property in T.S. Johnson's Estate as found in a report of the Orphan's Court (the "Orphan's Court Report"),[162] refers only to the Doe Bridge Mill Property and lands of Isaac Burton as adjoiners, thus not providing the fuller description of T.S. Johnson's property as provided in the 1867 Exchange Deeds, which the parties agree included Parcel 46. However, the parties have pointed to no deed out, and I presume Johnson owned the property at the time of his death. This presumption is bolstered by references in later deeds out[163] and specified deed book references.[164] Nonetheless, Sweetwater argues that

---

[162] The Orphan's Court Report was filed by T.S. Johnson's executors in a proceeding commenced by his Estate for the sale of his lands to pay his debts. Respts' Post-Trial Opening Br. 54.

[163] *See, e.g.,* JX 6 (1871 Sheriff's Deed referencing "the lands of said Mary B. Dorey," said to include "*all* that certain tract or parcel" described in the deed by improvements to the land, and adjoiners, as well as nearly identical acreage to the 1867 Exchange Deeds (emphasis added)).

[164] *See* JX 4 (1919 deed from Custis Burton to Joseph Iliffe and William E. Matthews describing the land conveyed by reference to deed recorded in volume 168, page 566, which is the Orphan's Court Report describing the lands held by T.S. Johnson at his death (JX 5)); JX 3 (1924 Sheriff's Deed to Wingate E. Matthews in execution of a judgment against Joseph Iliffe and Wingate E. Matthews (likely intended to be William E. Matthews), also referencing the deed at volume 168, page 566; *see also* 4 Tiffany Real Prop. § 992 (3d ed.) ("[A] general description in a deed will usually yield to a specific description in another instrument incorporated in the deed by reference.").

46

the Orphan's Court Report regarding T.S. Johnson's estate fails to contain a description of his property compatible with Johnson having owned lands south of the Road at the time of his death. I note that the Report (which refers to the property near Doe Bridge Mill as T.S. Johnson's "Tract # 7") is, together with its associate deeds, the only document created after the 1867 Exchange Deeds in the State's chain that does not include some sort of reference by which I can presume, from its face, that the document conveyed land traceable to the specific descriptions in the 1867 Exchange Deeds, including property south of the Road. I find, in any event, that this Report most likely intended to describe the land covered by both of the 1867 Exchange Deeds, which land T.S. Johnson owned following the 1871 Sheriff's Deed from Mary Dorey.

As Sweetwater points out, the descriptions of Tract # 7 in T.S. Johnson's estate and deeds therefrom refer only to the Doe Bridge Mill Property and lands of Isaac Burton as adjoiners, which Sweetwater contends reflects the fact that the land conveyed lay entirely *north* of the Road, on the assumptions that (1) Isaac Burton owned Parcel 46 and (2) the descriptions would otherwise identify additional adjoiners. However, it is just as plausible that T.S. Johnson owned Parcel 46 (together with land north of the Road adjacent to it) with Isaac Burton as an adjoiner *on what is now Parcel 44* and the Doe Bridge Mill Property to the east. I discuss this possibility in reference to Sweetwater's title claim, below. The remaining

47

adjoiner—*i.e.*, to the north of Tract # 7—very well could have been another of T.S. Johnson's tracts identified in the Orphan's Court Report—specifically, "tract no. 5, containing 300 acres more or less . . . said tract known as the Benjamin Morris property."[165] T.S. Johnson purchased Benjamin Morris's land, which land is now included in the Stockley Property, at an 1871 sheriff's sale.[166] I find that the Orphan's Court Report is insufficient to evidence an abandonment of the descriptions of Johnson's ownership recited in the Exchange Deeds; in other words, it is not necessarily incompatible with evidence indicating that Johnson owned Parcel 46 at his death.

In 1891, the Estate of T.S. Johnson conveyed property to Custis Burton described as land in Dagsboro Hundred, "adjoining the Doe Bridge Mill property, lands of Isaac Burton and others, containing one hundred (100) acres more or less."[167] I have found that the 1867 Sheriff's Deed conveyed an interest in Parcel 46 to T.S. Johnson,[168] and that the Orphan's Court Report, adding the reference to the

---

[165] JX 20.

[166] *See* Respts' Post-Trial Reply Br. 14 n.8; Trial Tr. 1857:14–23 (Hooper).

[167] JX 5. The description in the 1867 Sheriff's Deed transferring John Dorey's interest to T.S. Johnson does not contain this reference to the Doe Bridge Mill Property or Isaac Burton as adjoiner; this description seems to have been added by the Orphan's Court Report.

[168] I find that the 1867 Sheriff's Deed is not void for its lack of description. It is not the case that the "identity is *wholly uncertain*," or that the 1867 Sheriff's Deed "does not contain a description sufficient to identify the land intended to be conveyed with *reasonable certainty* and to locate and distinguish it from other lands of the same kind" rendering it void. 23 Am. Jur. 2d Deeds § 40 (emphasis added). Given the facts recited above, I find with "reasonable certainty" that the 1867 Sheriff's Deed intended to convey Parcel 46. *See* 4 Tiffany Real Prop. § 997 (3d ed.) (providing "the broad principle that a conveyance will not be declared void for insufficiency in its description

48

Doe Bridge Mill Property and Isaac Burton as adjoiner, did not abandon the prior description of the properties so as to not include Parcel 46. Therefore, I find it likely that Johnson died in possession of Parcel 46. In 1891, Custis Burton purchased property from T.S. Johnson's Estate which included Parcel 46.[169] Custis Burton conveyed the property to Joseph Illiffe and William Matthews in 1919.[170] In 1924 the property was passed by sheriff's deed to Wingate Matthews, Fred Lawson, and Phillip Johnson.[171] The property was conveyed by deed in 1927 to Wingate Matthews, who in turn conveyed it to the State in the 1931 Matthews Deed.[172]

I now turn to the title claims advanced by Sweetwater.

### D. *Sweetwater's Alternative Chain of Title*

Sweetwater traces its chain of title back to 1879 to a sale of lands from the Sheriff of Sussex County to Elizabeth Burton (the "1879 Burton Deed") which was not recorded until 1890.[173] The 1879 Burton Deed describes the land as a parcel "in Dagsboro Hundred, Sussex County containing forty acres, more or less, adjoining lands of the heirs of George W. Hearn, Deceased, Benjamin Morris, Tilghman S.

---

of the property which it purports to convey, if it is possible by any reasonable rule of construction, aided by extrinsic evidence, to identify the property intended, [and noting that] it is impossible to give any general rules by which to determine whether, in the case of any particular conveyance, the description is sufficiently definite to render the instrument operative.").

[169] JX 1; s*ee* JX 5.
[170] JX 4.
[171] JX 3.
[172] *See* JX 1–JX 2.
[173] JX 140, JX 147.

Johnson and heirs of James Donohoe,[174] Deceased, and others, with a single story dwelling house, smoke house[,] [illegible] house and stables thereon."[175] It does not include a metes and bounds description, or calls to any monuments, other than these adjoiners.[176] Sweetwater relies solely on the adjoiners described to locate this property, as discussed below.[177] The lands which were transferred to Elizabeth Burton by the Sheriff were formerly held by Isaac Burton.[178] However, the record does not establish how Isaac Burton derived his title; in other words, Sweetwater cannot trace title from Burton Morris—who it concedes held title to what is now Parcel 46 as of 1829—in to Isaac Burton in 1879; a period of fifty years.[179] I examine

---

[174] The spelling of Donohoe, like Dorey, suffers from an added or dropped "e" in various places. The parties do not contend that the spelling differences are attributable to identity differences. Thus, my opinion will refer to "Donoho" relying on the parties' representations.

[175] JX 140; JX 147. While Sweetwater presented interesting archaeological evidence suggesting a dwelling on Parcel 46, this does not conclusively indicate that this is the "dwelling house" referred to in the deed in to Isaac Burton; while the 1879 Burton Deed mentioned a dwelling, so did the 1867 Sheriff's Deed to T.S. Johnson, a deed which called to Isaac Burton as an adjoiner. That is to say, from these two sheriffs' deeds, we should assume that Isaac Burton and T.S. Johnson were neighbors, and each had land with a house on it. We cannot identify the remains of a dwelling to either definitively.

[176] Sweetwater contended that I should find the 1867 Sheriff's Deed in the State's chain of title void for failure of adequate description of the property transferred; I demurred, but I note that had I agreed I would be likely to make the same conclusion about this 1879 sheriff's deed (the 1879 Burton Deed).

[177] Calls to adjoiners are considered akin to monuments when determining the intent of a conveyance. *See* 4 Tiffany Real Property § 993 (3d ed.).

[178] JX 140; JX 147.

[179] *See* Stip 30 ("No evidence has been found of any conveyance or other transfer to Isaac Burton of title to any land south of the Road, either of Parcel 44 or Parcel 46; however, it is not disputed that in 1867 Isaac Burton owned land on the South side of the Road; only the location of such land is in dispute."). In its memoranda following review of the draft version of my decision on record title, Sweetwater recapitulated its evidence regarding its own strength of title. I have reviewed this

50

the location of lands conveyed by the 1879 Burton Deed, by reference to the therein-called adjoiners, below.

### 1. Adjoiner: Benjamin Morris

The parties agree that Benjamin Morris at one time owned land north of the Doe Bridge Road, comprising what is now known as the Stockley Center and at the time of the 1931 Matthews Deed was called the Delaware Colony.[180]  I note, however, that Morris's interest had been sold at a sheriff's sale, eight years *before* the 1879 Burton Deed, to T.S. Johnson.[181]  In light of that sale, it is not clear to what property the call to lands of Benjamin Morris, as an adjoiner, referred.  But, at any rate, even assuming the call was an outdated reference to lands north of the Road that had once belonged to Benjamin Morris, that land would "adjoin" Parcel 46 only at a single point.[182]  As Sweetwater concedes, by way of argument on another topic, the usage "adjoiner" rarely is used to describe properties that are adjacent only at a single point, rather than sharing a boundary line.  In fact, Sweetwater maintains that

---

argument in light of the record; nonetheless, I remain convinced that the State's title is superior, for all the reasons in this Memorandum Opinion.

[180] The State recorded the Articles of Dedication as part of its plan to create a Nature Preserve which would occupy all of what was known as the Stockley Center, which was also known as the Delaware Colony for the Feeble Minded.  Respts' Post-Trial Opening Br. 26; Stip 23, 35.

[181] Respts' Post-Trial Reply Br. 14 n.8; Trial Tr. 1857:14–23 (Hooper).

[182] Petr's Post-Trial Opening Br. 37.

"[p]roperties that touch at a point, rather than share a common boundary line, are not regarded as contiguous 'adjoiners.'"[183]

Sweetwater focuses its efforts to explain the 1879 Burton Deed on the other calls to adjoiners—particularly the heirs of Hearn and heirs of Donoho, which I briefly discuss below. Taking all evidence together, including the apparently erroneous call to Benjamin Morris—which, even if meant to call to his *former* lands, would place him as a "single point" adjoiner—I find it unlikely that Isaac Burton's lands, conveyed by the 1879 Burton Deed, included Parcel 46.

### 2. Adjoiner: Heirs of Hearn

An 1880 Orphan's Court order regarding the Estate of George W.C. Hearn included a plat showing his land located adjacent, to the south, to both Parcel 44 and Parcel 46, and occupying what is now Parcel 45.[184] Since the lands of the Hearn heirs adjoin both parcels, this reference is insufficient to support Sweetwater's title claim.

### 3. Adjoiner: Heirs of Donoho

Sweetwater traces title to Parcel 44—which, as reference to the maps attached as exhibits demonstrate, adjoins Parcel 46 to the west—to a 1905 deed from the heirs

---

[183] Respts' Post-Trial Opening Br. 49 (citing 1 Am. Jur. 2d Adjoining Landowners § 1; *Olmstead v. Schrembs*, 165 N.E. 51, 52 (Ohio Dist. Ct. 1928)).
[184] JX 57.

of James Donoho.[185]  James Donoho purchased a parcel with a house in 1851, with the deed describing the land as adjoining lands of Robert Morris of L., the heirs of Simon K. Wilson, and others, and containing seven acres.[186]  Plats recorded with the Orphan's Court relating to third-party land ownership, notably relating to Simon K. Wilson, suggest that this Donoho land was situated within what is now Parcel 44 along its southern boundary, where the land adjoins Mirey Branch,[187] but the record casts doubt on the reliability of those plats to show the entirety of an adjoiner's lands.

Robert Morris of L., called as an adjoiner in Donoho's 1851 deed, was Lacey Morris's son.[188]  Evidence shows Lacey Morris had purchased seventy-five acres from the Estate of Isaiah Morris, adjacent to the seven acres that Captain John and Nancy Morris purchased from that same sale of Isaiah Morris's land.[189]  (By way of reminder, Lacey Morris also owned Whaples Preserve and Dry Boots, which the parties stipulate included Parcel 46, among other lands).

---

[185] JX 38.

[186] JX 110 at 17; *id.* Ex. 40.  Donoho purchased the land from Wingate and Lovey Morris, who in turn had purchased it from John West.  John West obtained the property from Captain John and Nancy Morris, who had obtained it from the Estate of Isaiah Morris.  *Id.*

[187] JX 110 at 17; *id.* Ex. 45.

[188] Respts' Post-Trial Reply 7–8 (citing JX 110 Ex. 45)

[189] JX 110 at 20.  Isaiah Morris inherited property from his father Joshua Morris in 1808.  *Id.* at 23.  Upon his passing, the property was split and seventy-five acres were sold to Lacey Morris, with ten acres (including the dwelling located on the property) remaining with Isaiah Morris's widow.  *Id.* at 21. Solely based on tax assessments, Sweetwater's genealogist Debbie Hooper ("Hooper") then assumes that those remaining ten acres were purchased by Capt. John Morris.  *Id.* at 22. The amount of land in fact owned by Capt. John Morris and later transferred through several owners to Donoho lies between seven and ten acres with inconsistencies in the records.  *See id.* at 20.

The deeds in to Lacey Morris and Captain and Mrs. Morris identified those lands conveyed as a portion of Barnards Bloomery.[190] Barnards Bloomery is called to as an adjoiner in the 1829 Wilson Deed, by which Simon Wilson conveyed forty-five acres to Burton Morris, which the parties agree comprised most of Parcel 46.[191] This boundary line in the 1829 Wilson Deed, Sweetwater notes, closely approximates the boundary between Parcels 44 and 46, suggesting that Barnards Bloomery was located on Parcel 44,[192] which, by extension, might place James Donoho's seven acres on Parcel 44, depending, of course, on the size of Barnards Bloomery. The research of Sweetwater's genealogist Debbie Hooper ("Hooper") showed that Barnards Bloomery was 158 acres when first patented in 1762;[193] but it is not clear how I am to determine where on the 158 acres of Barnards Bloomery these parcels were carved out and conveyed.[194]

---

[190] A bloomery, I learned in this litigation, is a primitive iron smelter.

[191] JX 12.

[192] Respts' Post-Trial Reply Br. 8.

[193] JX 110 at 22–23 (opining on the history of Barnards Bloomery, and noting that, at a later time, but prior to 1808, one John Morris apparently sold a portion of Barnards Bloomery to William Morris; the latter "expanded his portion of Barnards Bloomery *to contain approximately 451 acres*.") (emphasis added); *see id.* Ex. 64; Trial Tr. 1835:15–21 (Hooper).

[194] *See, e.g.,* 4 Tiffany Real Prop. § 997 (3d ed.) ("Generally, also, a description in a deed is sufficient if it provides a key by which the land conveyed may be identified. A case of insufficiency of description would ordinarily arise whenever the conveyance is in terms merely of a tract, or of a tract of a certain size lying in a certain region or neighborhood, without anything to indicate its exact location. And a case of insufficiency of description quite frequently arises by reason of a conveyance in terms of a part of a tract, without any indication of its position in such tract."). I note that Hooper's report references "[a] copy of a plat showing Barnards Bloomery in relation to today's Tax Parcel 44," but no such exhibit is included. JX 110 at 23.

Even if I assume that the Donoho parcel of seven acres lay within Parcel 44, Sweetwater is unable to show by a preponderance of the evidence the source of the *additional* twenty-three acres contained in Parcel 44, which, in Sweetwater's view, was at some point in time combined with the seven Donoho acres to comprise the entirety of Parcel 44. Sweetwater suggests that those twenty-three acres were passed from heirs who received Lacey Morris's seventy-five acres (which he had purchased from the Estate of Isaiah Morris), in the vicinity of Parcel 44, which heirs included Robert Morris of L. and his children; thereafter, "after their families intermarried, title to all of Parcel 44 was consolidated in their combined descendants."[195] Under

---

[195] Respts' Post-Trial Reply Br. 10. Sweetwater presented expert testimony from a genealogist that set forth this conceptualization in greater detail:

Robert Morris of L., father of Mary Morris Spicer and Benjamin Morris, and others, left his land to his children Mary and Benjamin. Benjamin Morris owned land on the north side of the Road, in the southern area of what is now Parcel 8. *See* Trial Tr. 1769:22–1771:14 (Hooper). Mary Morris Spicer was taxed on seventy-five acres from Robert Morris of L. in 1860; her father had died in 1857. JX 110 Ex. 37. Hooper suggested that Mary and her brother each came to own land south and north of the Road, respectively, by way of amicable partition. *See* Trial Tr. 1776:6–9 (Hooper). In the 1872 tax records, Mary was assessed on ninety acres. JX 110 Ex. 38.

Mary died intestate in 1887, and her land apparently passed in equal shares to her four children. In the absence of evidence of a partition action, Hooper suggested the children had divided the land amicably, and equally, with each receiving approximately twenty-two and one-half acres, and that it "makes sense for William [E. Spicer] to have chosen the portion of land closest to the land holdings of his wife, Elizabeth (Donohoe) Spicer, daughter of James Donohoe." JX 110 at 16. This twenty-two and one-half acres, she suggests, was combined with Elizabeth Donohoe Spicer's seven acres inherited from her father. She points to a deed conveyed by William E. Spicer, Elizabeth Donohoe Spicer, and Maranda Donohoe Morris Otwell, described as containing thirty acres as bolstering this theory. She noted that no other deed out from William E. Morris of the twenty-two and one-half acres he may have received from his mother's estate was found. *Id.*

Hooper ruled out the possibility that William E. Spicer's land conveyed to the heirs of Donoho was the land formerly owned by his father, also William Spicer. When the elder William Spicer died, he owned 145 acres; his widow, Mary Morris Spicer, waived her dower right to one

this theory, Sweetwater purports to demonstrate that Donoho's heirs acquired all of Parcel 44. Sweetwater further points to the general warranty deed the Donoho heirs executed to a successor-in-interest, in which they promised to forever defend title against third-party claims, as evidence of the strength of the Donohos' claim to Parcel 44, not Parcel 46.[196] No further evidence supports Sweetwater's claim that the Donoho heirs owned all of Parcel 44.[197] In a case necessarily full of speculation from both parties, I find this assertion to be perhaps the least supported by the record.

For its part, the State suggests that the seven acres belonging to the heirs of Donoho was actually a parcel of land situated on both sides of what is now Route 318—only partially on Parcel 44, with the remainder to the west.[198] Under this theory, Isaac Burton could adjoin the heirs of Donoho while himself owning land in

---

third of the land, so the land was instead passed to their five children in equal one-fifth shares. JX 110 at 15. William E. Spicer purchased two of his siblings' shares in the land on October 8, 1877, leaving him with eighty-seven acres. *See* JX 110 at 15; JX 110 Ex. 39, Ex. 40. He conveyed that eighty-seven acres, which Ms. Hooper opined was all or much of Parcel 45, to the south of Mirey Branch, to Henry Ingram in 1881. *See* JX 110 Ex. 41. Accordingly, she found it more plausible that it was land William E. Spicer inherited from his mother that was combined with his wife's land to create what is now Parcel 44.

[196] JX 91; *see* Respts' Post-Trial Reply at 12. However, there is no indication that the general warranty deed in fact referred to defending the title of Parcel 44, only to defending the Donoho lands wherever located. In its supplement post-draft opening memorandum, Sweetwater contends that I misapprehend its argument here; if so, it is out of insufficiency of intelligence, not will.

[197] Sweetwater counters the State's attack on the strength of the evidence provided by Hooper by providing that Hooper's analysis of the passing of title to the remaining twenty-three acres in Parcel 44 is "not critical to [its] defense" explaining that it is the State's burden "to prove Donoho's heirs did not own the 30 acres they conveyed to Frank Lawson in 1905." Respts' Post-Trial Reply Br. 14.

[198] *See* Petr's Post-Trial Opening Br. 45.

Parcel 44, rather than Parcel 46.[199] The State explains that without evidence of Donoho owning more than seven acres, Isaac Burton could own his thirty acres within Parcel 44 without conflicting with Donoho's ownership.[200] The State further attacks Sweetwater's claim by noting that Sweetwater's contention that the 1879 Burton Deed that conveyed Parcel 46 would necessitate Benjamin Morris being called an "adjoiner" despite his lands having only a single point of contact with the granted parcel, which both parties agree not to be common usage.[201] However, if Donoho in fact owned seven acres straddling the road now known as Route 318, Morris would be a true adjoiner to Isaac Burton, assuming Burton—not Donoho— owned the majority of Parcel 44. In other words, under this theory, the location of Donoho's seven acres would have been to the west of—and remote from—Parcel 46. In that case, the Donoho lands would adjoin those of Isaac Burton only if Burton owned land in Parcel 44, and not Parcel 46, as Sweetwater contends.

In further support of the State's theory that Isaac Burton owned land in Parcel 44, it points to Burton's purchase of additional land in 1864 (via the "sliver deed"), the location of which (according to the State) makes it more likely that he owned Parcel 44, rather than 46.[202] The State's theory is that the sliver deed transferred a

---

[199] *See id.* at 37–40.
[200] *See id.* at 45, 50.
[201] *Id.* at 37.
[202] Petr's Post-Trial Opening Br. 39; JX 100.

peculiarly-shaped parcel unlikely to be of value to anyone other than the owner of Parcel 44 to which it appends, suggesting that the owner of that property was Isaac Burton.[203]

I need not accept the arguments of the State to find that Sweetwater's claim to record title is not strong. As I trust the discussion above demonstrates, I have considered the title evidence, both incorporated in deeds and extensive extrinsic evidence, carefully, and I find that the State's record title evidence, while not unimpeachable, is stronger than that of Sweetwater. I find by a preponderance of the evidence that the State has established record title to Parcel 46 for purposes of this action.[204]

## IV. EQUITABLE DEFENSES

Despite the fact that title lies in the State, Sweetwater contends that "equitable defenses" should prevent me from confirming that title. I have grave doubts that equitable defenses are applicable, generally, to record title. The concepts raised by Sweetwater are equitably compelling, and will no doubt attach in the next phase of

---

[203] Petr's Post-Trial Opening Br. 39. The sliver deed I speculate, but need not decide, was a transfer made desirable by a slight deviation in the route of the Doe Bridge Road.

[204] Sweetwater has persuaded me that Isaac Burton likely owned either Parcel 44 or Parcel 46. I do not find a preponderance of the evidence to support a finding that he owned Parcel 46 *rather than* 44, however. And a finding that Burton owned Parcel 44 better harmonizes with the entirety of the evidence.

this litigation, which will involve relief owed Sweetwater. Nonetheless, in the interests of efficiency, I consider them briefly below.

*Unclean hands.* Unclean hands is a doctrine by which equity guards its reputation by refusing to extend equitable relief to one who himself has acted inequitably in the matter.[205] It cannot apply, in my understanding, to defeat record title to real property, which itself is a legal, not equitable, estate.

Sweetwater argues that application of the doctrine is mandated here, nonetheless. "Unclean hands should be no less abhorrent to Equity when brought into Court on the outstretched arms of the State."[206] This is true, and most felicitously stated. However, what the State has done here has been to fail to assert its rights until Sweetwater had invested substantial money and effort into developing Parcel 46. If actionable at law or equity, a remedy for such behavior awaits in the next phase of this litigation. The conduct of the State, while careless of its rights and others, is not so inequitable here as to cause me to apply unclean hands to the issue of title, particularly in light of the fact that the relief granted here is legal, not equitable.

---

[205] *See Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998) ("The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.").

[206] Respts' Post-Trial Reply Br. 36.

*Laches.* Stated simply, Sweetwater alleges that the State failed—in a spectacular fashion—to assert its ownership interest over a period of years, in reliance on which Sweetwater purchased Parcel 46 and invested in its development. Laches is an equitable doctrine declining to reward she who sleeps upon her rights; it operates like an equitable statute of limitations.[207] The analogous limitation period for asserting title is twenty years.[208] The State, however, exempted itself from even that generous stricture, in 1953.[209] If laches were available to defeat record title held by the State, the sovereign's prerogative here would be meaningless. Any relief for the delay of the State must be found in the next phase of litigation.

*Acquiescence and estoppel.* Finally, Sweetwater raises acquiescence and equitable estoppel as fatal to the State's assertion of legal title. Those doctrines are similar but not identical: equitable estoppel focuses on the reasonable reliance of the

---

[207] *See Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) ("Laches bars an action in equity if: [t]he plaintiff waited an unreasonable length of time before bringing the suit and . . . the delay unfairly prejudices the defendant. Therefore, laches generally requires proof of three elements: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant. This doctrine is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights.") (internal quotations omitted).

[208] *See supra* note 1.

[209] *See supra* note 3.

plaintiff,[210] acquiescence on the actions of the defendant.[211]  I will not repeat the description, provided in the facts section of this Memorandum Opinion, of the State's actions and failures to act while aware of the investments by Sweetwater and its predecessors in title.  In light of those acts, Sweetwater's assertions of acquiescence and estoppel are by no means trivial; the State acted as if it did not have title, and Sweetwater's reliance thereon was reasonable, at least until late in the process (how late remaining an issue for further litigation).  Moreover, the State was not only aware that Sweetwater was expending resources in development of Parcel 46; the State itself participated in the process.  Legal and equitable relief remain to be determined in the next phase of this action.  I have stated above that I doubt either of these defenses can defeat record title here, but in light of the fact that the scope of relief awaits the next phase of litigation, I reserve decision on the applicability of acquiescence and estoppel.

---

[210] *See Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) ("The doctrine of equitable estoppel applies when a party intentionally, or unintentionally, induces another to detrimentally rely on the party's conduct.  For an estoppel claim to prevail, it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question, relied on the party against whom estoppel is claimed, and suffered a prejudicial change in position as a result of that reliance.") (internal citations omitted).

[211] *See Fotta v. Morgan*, 2016 WL 775032, at *8 (Del. Ch. Feb. 29, 2016) ("The Delaware Supreme Court has established a clear test which states that the doctrine of acquiescence applies where a claimant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved. . . . [A]cquiescence centers on the *[d]efendant* and *its* understanding that complained-of acts were acquiesced in.") (emphasis in original) (citations omitted) (internal quotations omitted).

## V. CONCLUSION

For the foregoing reasons, I find that the State holds record title to Parcel 46. The Parties should confer and inform me how they intend to proceed in light of this Memorandum Opinion.

**Exhibit A**

Doe Bridge Road

Mirey Branch

Cow Bridge Branch

Parcel 44

Parcel 46

SHEEP PEN DITCH

INDIAN RIVER

INDIAN RIVER

DAGSBORO

HUNDRED

PATRIOTS WAY

133-12.00

Millsboro Mill Pond

234-32.00

# Sussex County Delaware
## 133-11.00



**Legend**

Map Line

Municipal Boundaries



N
W    E
S

**Exhibit B**



## Exhibit C



**Exhibit D**



Affected portion of Parcel 46

**Exhibit E**

**Figure 1.
The State's Chain of Title**



"Dry Boots"
By Proprietors Warrant[i]
April 10, 1776

**Smith Frame**

By Will
1786

**Nathan Frame**

By Deed[ii]
April 20, 1802

**Lacey Morris**

By Will

**Simon Kollock**          **Hetty Prettyman** ( ½ interest)          **Burton Morris** (½ interest)

By Will

**Simon Wilson**

By Deed[iv]
April 1, 1824

**Burton Morris**

By Wilson Deed[iii]
April 18, 1829

**Burton Morris**

By Will[v]
1835

**Patience Morris** (+ Benjamin H. Dorey)

(½ interest each)

**Mary B. Dorey**          **John H. Dorey**

By Southern Exchange Deed
July 20, 1867

By 1867 Sheriff's Deed[vi]
April 24, 1867

**T.S. Johnson**

By Deed[vii]
1891

**Custis Burton**

By Deed[viii]
1919

**Joseph Illiffe, William Matthews**

**Wingate Matthews, Fred Lawson, Phillip Johnson**

By Deed[ix]
1927

**Wingate Matthews**

By 1931 Matthews Deed[x]
November 20, 1931

**State**

## Figure 2.
## Sweetwater's Chain of Title



By 1879 Burton Deed[xi]
May 12, 1879

**Elizabeth Burton**

By Deed[xii]
June 22, 1891

**John J. Burton**

By Deed[xiii]
March 28, 1910

**John Wesley Harmon**

By Deed[xiv]
February 26, 1917

**Abel Ableman**

**Meyer Ableman**

By Deed[xv]
May 19, 1953

**Houston-White, Co.**

By Deed[xvi]
January 10, 1997

**J. Reese White, Jr., Virginia T. Frazier, Mary W. McMahon**

**Estate of Margaret White**

By Deed[xvii]
2005

**Sweetwater**

[i] JX 17, JX 18.
[ii] JX 15.
[iii] JX 12
[iv] JX 13
[v] JX 10.
[vi] JX 9.
[vii] JX 5, JX 20.
[viii] JX 4.
[ix] JX 2.
[x] JX 1.
[xi] JX 140.
[xii] JX 141.
[xiii] JX 142.
[xiv] JX 143.
[xv] JX 144.
[xvi] JX 145.
[xvii] JX 146.